IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MEMORIAL HERMANN HEALTH SYSTEM, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-13-1280 |
| | § | |
| COASTAL DRILLING COMPANY, LLC EMPLOYEE BENEFIT TRUST and COASTAL DRILLING, | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This ERISA case is before the Court on the parties' cross-motions for summary judgment.  Defendants Coastal Drilling Company, LLC Employee Benefit Trust and Coastal Drilling (collectively, "Coastal Drilling" or "Defendants") filed a Motion for Summary Judgment [Doc. # 35] ("Defendants' Motion") and Plaintiff Memorial Hermann Health System ("MHHS" or "Plaintiff") filed a Response and its own Motion for Summary Judgment [Doc. # 39] ("Plaintiff's Motion").[1]  These motions are ripe for consideration.  Having reviewed the parties' briefing, the applicable legal authorities, and all matters of record, the Court **denies** Plaintiff's Motion for

---

[1]     Defendants also filed a Reply and Response to Plaintiff's Motion [Doc. # 40] and Plaintiff filed a Reply [Doc. # 41].

Summary Judgment and **grants** Defendants' Motion for Summary Judgment.  This

case is **dismissed with prejudice.**

## I.   BACKGROUND

MHHS instituted this action to collect money it claims it is owed by Coastal

Drilling.  The Court first summarizes the agreements relevant to this case.  Next, the

Court discusses the particular circumstances that prompted this lawsuit.  Finally, the

Court concludes this background section by detailing the procedural posture of this

case and the claims MHHS asserts against Coastal Drilling.

### A.   Relevant Agreements

There are five agreements pertinent to the parties' dispute.  Pertinent provisions

in each are summarized below.[2]

### 1.   Coastal Drilling's ERISA Plan

Defendant Coastal Drilling is an employer doing business in Texas.  Coastal

Drilling provides its employees with medical insurance benefits through a self-funded

insurance plan, as defined under the Employee Retirement Income Security Act

("ERISA"), known as the Coastal Drilling Company, LLC Employee Benefit Trust

(the "ERISA Plan" or "Plan").  The ERISA Plan is essentially an agreement between

---

[2]     Attached as Exhibit A to the Memorandum and Order is a chart diagraming the
contractual relationships between the parties, as described above.

Coastal Drilling and the Plan's beneficiaries.[3]  The Plan provides that Coastal Drilling will cover the "Usual and Reasonable Charges, or for claims under the Claim Review and Audit Program, [charges] within the Applicable Plan Limits, that are incurred for" certain services and supplies.[4]  The term "Applicable Plan Limits" ("APL") is further defined as "the charges for services and supplies . . . which are Medically Necessary for the care and treatment of Illness or Injury, but only to the extent such fees are within the Applicable Plan Limits."[5]  Coastal Drilling, which is the Plan Administrator, has discretionary authority to determine whether a charge falls within the ERISA Plan's APL.[6]

The ERISA Plan also excludes certain payments to providers and limits the total amount of charges available under the Plan.  For example, the Plan prohibits payments for "Excess Charges,"[7] defined as "[t]he part of an expense for care and treatment of an Injury or Sickness that is in excess of the Usual and Reasonable

---

[3]  *See* ERISA Plan [Doc. # 37], at 1 ("The Plan described is designed to protect Plan Participants against certain catastrophic health expenses.").

[4]  Amendment No. Two to the ERISA Plan [Doc. # 35-3], at 1.

[5]  *Id.*, at 2.

[6]  *Id.*

[7]  *See* ERISA Plan [Doc. # 37], at 42.

Charge or . . . that is in excess of the Applicable Plan Limits."[8]  Furthermore, the

ERISA Plan specifically states that:

> Notwithstanding any conflicting contracts or agreements, the Plan may consider the Applicable Plan Limits as the maximum amount of Covered Medical Expense that may be considered for reimbursement under the Plan, and may apply this determination in lieu of any PPO network provider hospitals' per diem, DRG rates or PPO discounted rates as the amount considered for reimbursement under the Plan.  Additionally, in the event that a determination of an Applicable Plan limit exceeds the actual charge billed for the service or supply, the Plan will consider the lesser of the actual billed charge or the Applicable Plan Limit determination.[9]

### 2.    Administrative Services Agreement

In early 2003, Coastal Drilling entered into a contract with Insurance Systems,

Inc. ("ISI"), under which ISI provides administration and coordination services for

the ERISA Plan (the "Administrative Services Agreement").[10]   Under the

Administrative Services Agreement, ISI is required to "[u]se that degree of ordinary

care and reasonable diligence in the exercise of its power and duties hereunder that

a supervisor of claims under an insured or uninsured employee benefit plan would use

---

[8]      Amendment No. Two to the ERISA Plan [Doc. # 35-3], at 3.

[9]      *Id.*

[10]      *See* Administrative Services Agreement [Exh. 4 to Doc. # 37-1], at 1-2.

acting in like circumstances and familiar with such matters."[11]   ISI must also

"[d]etermine, in accordance with the Benefit Plan and the administration procedure

and practices, the qualifications of claims submitted, making, as required, such

investigation as may be necessary."[12]

### 3.    TPA Agreement

On December 30, 2003, ISI entered into a contract with PPOplus, LLC

("PPOplus") (the "TPA Agreement").[13]   ISI entered into the TPA Agreement "as an

entity providing services to self-funded welfare benefit Plans and wish[ing] to make

available a provider network for the provision of medical, hospital and other health

services available to Groups."[14]   Under the contract, PPOplus makes a network of

healthcare providers available to ISI and ISI's clients.[15]   In exchange, ISI agrees to

compensate providers under the terms of the TPA Agreement, including that:

---

[11]    *Id.*, at 2.

[12]    *Id.*, at 3.

[13]    In the TPA Agreement, ISI is referred to as "TPA."  *See* TPA Agreement [Exh. 6 to Doc. # 37-1], at 1.

[14]    *See id.*  "Group" is defined in the TPA Agreement as "an employer, union, governmental agency, association, Taft Hartley trust, third party payer, third party administrator, but [not] a federal or state reimbursement program or charity program." *Id.*, at 2, ¶ 1.5.

[15]    *Id.*, at 5, ¶ 3.1

TPA [*i.e.*, ISI] agrees to pay claims of Participating Providers in accordance with the applicable Plan and the PPO Contracted Rates. TPA shall be required within thirty (30) days after receipt of a non-electronic Complete Claim or twenty-five (25) days of submission of an electronic Complete Claim for Covered Services to (i) insure that Group makes payment for a Complete Claim for Covered Services provided to a Beneficiary, (ii) determine that a claim is not a Complete Claim and request any information necessary to make such claim a Complete Claim, (iii) notify Participating Providers of the status of any such claim, and (iv) endeavor to resolve promptly any claim that is determined not to be a Complete Claim.  Failure of Group to provide payment to Participating Providers within thirty (30) days of submission of a non-electronic Complete Claim or within twenty-five (25) days of submission of an electronic Complete Claim shall, absent agreement between the parties of there being reasonable cause for such failure, constitute a waiver by Group of its right to make payments in accordance with PPO Contracted Rates.  Group shall then be required to reimburse Participating Provider's billed charges for those Covered Services.[16]

### 4.    Network Access Agreement

Prior to the TPA Agreement, on January 1, 2002, PPOplus and Healthsmart Preferred Care, Inc. ("HSPC") entered into a contract pursuant to which HSPC gained access to PPOplus's network of healthcare providers (the "Network Access Agreement").  The Network Access Agreement refers to "Clients," which are defined as "insurers, payors and third party administrators."[17]  With regard to compensation of PPOplus's providers, the Network Access Agreement provides:

---

[16]     *Id.*, at 3, ¶ 2.2

[17]     Network Access Agreement [Exh. 3 to Doc. # 37-1], at 1.

HSPC shall require Client to pay claims of Participating Providers in accordance with the applicable Plan and the PPOplus Contracted Rates, which are the rates or fees agreed upon by PPOplus and Participating Provider.  Client shall be required within thirty (30) days after receipt of a non-electronic Complete Claim or twenty-five (25) days of submission of an electronic Complete Claim to (i) make payment for a Complete Claim for covered services provided to a Beneficiary, (ii) determine that a claim is not a Complete Claim and request any information necessary to make such claim a Complete Claim, (iii) notify Participating Providers of the status of any such claim, and (iv) endeavor to resolve promptly any claim that is determined not to be a Complete Claim. Failure of Client to provide payment to Participating Providers within thirty (30) days of submission of a non-electronic Complete Claim or within twenty-five (25) days of submission of an electronic Complete Claim shall, absent agreement between the parties of there being reasonable cause for such failure, constitute a waiver by Client of its right to make payments in accordance with PPOplus Contracted Rates. Client shall then be required to reimburse Participating Provider's billed charges for those Covered Services.[18]

A later amendment to the Network Access Agreement grants PPOplus and its clients reciprocal access to HSPC's network of providers.[19]  Under that amendment, PPOplus must require its clients "to pay the claims of [HSPC's] Participating Providers in accordance with the applicable Plan and [HSPC's] Contracted Rates and within the delays and under the terms set forth in the January 1, 2002, Network Access Agreement."[20]

---

[18]     *Id.*, ¶ 11.

[19]     *See* Network Cross Access Agreement [Exh. 3 to Doc. # 37-1], at ECF-page 51.

[20]     *Id.*, at ECF-page 53, ¶ 11.

### 5.    Hospital Service Agreement

MHHS is a healthcare provider located in Houston, Texas.  On September 1, 2001, MHHS entered into an agreement with HSPC (the "Hospital Service Agreement").  HSPC entered into the agreement as an agent of its clients "to negotiate, monitor and control the purchase of health care services."[21]  Under the Hospital Service Agreement, MHHS agrees to furnish "Hospital Services"—that is, "inpatient, outpatient and emergency room services"—to covered individuals according to a "Fee Schedule."[22]  The amended fee schedule (entered into on March 11, 2008) establishes that, effective March 1, 2009, MHHS agreed to provide a 20% discount off of its billed charges to HSPC's clients.[23]  Thus, HSPC clients seeking medical services from MHHS pursuant to the Hospital Service Agreement are required to pay only 80% of MHHS's billed charges for those hospital services.

### B.    Claims and Benefits at Issue

Between April 26, 2011, and May 12, 2011, MHHS provided healthcare

---

[21]    *See* Hospital Service Agreement [Exh. 2 to Doc. # 37-1], at 1.  The Hospital Service Agreement defines "Client" as "an employer, insurance carrier, third party administrator, health care service plan, trust, or any government unit which has an obligation to provide benefits to a Covered Individual and which has entered into a Client Agreement with HSPC to participate in the HSPC provider network."  *Id.*

[22]    *See id.*, at 3, ¶ 1; 5, ¶ 11.

[23]    *See id.*, at ECF-page 28 (Healthsmart Preferred Care Maximum Allowable Schedule, Exhibit B-1 to Hospital Service Agreement).

services to "MF."[24]  During the period of treatment, MF was a participant in Coastal Drilling's ERISA Plan and was entitled to benefits under that Plan.[25]  MHHS alleges that at the time MF was admitted for care, an agent of Coastal Drilling and the ERISA Plan represented that MHHS would be paid pursuant to the terms of the Network Access Agreement.[26]

MHHS charged $312,655.15 for the services provided and submitted a claim in that amount to Coastal Drilling.[27]  Coastal Drilling, through its Designated Decision Maker ("DDM") ELAP Services, LLC ("ELAP"), determined that a payment of only $89,127.27 was warranted, denying charges in the amount of $223,527.88.[28]  Coastal Drilling made this determination in light of, among other things, its APL, the hospital's actual costs, fees charged by other providers in the same geographic area for those services and procedures, and other billing errors.[29]

---

[24]   Plaintiff's Original Petition [Doc. # 1-3] ("Complaint"), ¶ 9; Notice of Adverse Benefit Determination [Doc. # 35-1], at 1.  For privacy reasons, the parties have only presented the Court with the patient's initials.  *See* Complaint, ¶ 9.

[25]   Complaint, ¶ 9; Notice of Adverse Benefit Determination, at 1.

[26]   Complaint, ¶ 9; Letter from Lynne Sassi, dated June 22, 2012 [Doc. # 35-11], at 2.

[27]   Notice of Adverse Benefit Determination, at 1.

[28]   *Id.*; Letter from Lynne Sassi, dated February 7, 2012 [Doc. # 35-5], at 3.

[29]   Notice of Adverse Benefit Determination, at 2-3; *see also id.*, at 2 ("The attached spreadsheet of the review details with particularity the charges that are being denied (continued...)

On February 7, 2012, MHHS appealed Coastal Drilling's benefits determination, contending that MHHS was entitled to reimbursement of 80% of its billed charges under its contract with HSPC and requesting payment of a remaining balance of $175,994.65.[30]   MHHS also increased the total amount charged to $331,402.40.[31]  On appeal, ELAP determined that certain additional chargers were warranted, and Coastal Drilling paid MHHS an additional $3,096.00.[32] ELAP also determined, however, that MHHS was not entitled to 80% of its charges under its agreement with HSPC, because "[t]he Plan chose not to access its discount arrangement with PPOPlus in this case."[33]  On May 23, 2012, ELAP determined that MHHS was entitled to an additional $7,253.18, which Coastal Drilling subsequently paid.[34]  The total amount paid by Coastal Drilling to MHHS was $99,476.45.[35]

---

[29]      (...continued)
or partially denied due to apparent billing errors or overcharges exceeding this Plan's 'Applicable Plan Limits.'").

[30]      Letter from Lynne Sassi, dated February 7, 2012 [Doc. # 35-5], at 3.

[31]      *Id.*

[32]      Letter from ELAP Services, LLC, dated March 30, 2012 [Doc. # 35-7], at 3-4; Payment from Coastal Drilling to MHHS [Doc. # 35-8].

[33]      Letter from ELAP Services, LLC, dated March 30, 2012 [Doc. # 35-7], at 2.

[34]      Letter from ELAP Services, LLC, dated May 23, 2012 [Doc. # 35-10], at 1.

[35]      Letter from Lynne Sassi, dated June 22, 2012 [Doc. # 35-11], at 1; Complaint, ¶ 13.

On June 22, 2012, MHHS filed a second appeal, again asserting its right to an additional payment of 80% of its billed charges under the Network Access Agreement.[36]  ELAP determined that no additional benefits would be paid.[37]

### C.    Plaintiff's Claims

MHHS filed this suit in the 281st Judicial District of Harris County, Texas, on March 27, 2013, and served Defendants on April 15, 2013.  Defendants removed the case to this Court on May 2, 2013.[38]

MHHS asserts two claims against Defendants.  First, MHHS alleges that Defendants breached a contract between the parties to pay benefits at a certain rate and in a timely fashion.[39]  Second, MHHS sues, pursuant to 29 U.S.C. § 1132, for recovery of benefits owed to it under the ERISA Plan.[40]

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

---

[36]    Letter from Lynne Sassi, dated June 22, 2012 [Doc. # 35-11], at 1.

[37]    Letter from ELAP Services, LLC, dated July 16, 2012 [Doc. # 35-12], at 2-3.

[38]    *See* Notice fo Removal [Doc. # 1], at 1.

[39]    Complaint, ¶¶ 17-19.

[40]    *Id.*, ¶¶ 20-24.

fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond

the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the non-moving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (holding that unverified pleadings do not "constitute competent summary judgment evidence"). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003)

(citation and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The Court may make no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe.  *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412-413).  The Court is not required to accept the non-movant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *Id.* (citing *Reaves Brokerage*, 336 F.3d at 413).  Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See* FED. R. CIV. P. 56(c)(4); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted).

## III.   ANALYSIS

### A.   Breach of Contract Claim

#### 1.   ERISA Preemption

Congress designed ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983); *see also Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004) ("The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans."). To protect employee rights under the statute, "Congress included various safeguards to preclude abuse and to completely secure the rights and expectations brought into being by this landmark reform legislation." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990) (citing S. REP. No. 93-127, p. 36 (1973)). Among these safeguards are two different preemption provisions: 29 U.S.C. § 1132(a) and 29 U.S.C. § 1144(a).[41]   *Id.*

Congress, through Section 1132(a), created a civil enforcement mechanism that allows participants and beneficiaries of an ERISA plan, among others, to seek relief under the statute by bringing an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his right to

---

[41]   Many decisions refer to these provisions by their place in the ERISA statute, respectively, § 502(a) and § 514(a).

future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has read Section 1132 to preempt "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement scheme." *Davila*, 542 U.S. at 210. This form of preemption, often referred to as "complete preemption,"[42] is not at issue in this case.

At issue here is Section 1144(a), ERISA's "conflict preemption" provision. Under this provision, ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . ." 29 U.S.C. § 1144(a). The Supreme Court has noted that Section 1144(a) is "clearly expansive," but also "recognized that the term 'relate to' cannot be taken to extend to the furthest stretch of indeterminacy, or else for all practical purposes pre-emption would never run its course." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 146 (2001) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)) (internal quotations omitted). Accordingly, the Supreme Court has held "that a state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Id.* (quoting *Shaw*, 463 U.S. at 97). A court must look to

---

[42]     *See Davila*, 542 U.S. at 210 ("[I]f an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B).").

"the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." *Id.* (quoting *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997)).

The Fifth Circuit has articulated a more definite test to assess whether Section 1144(a) preempts state law.  To establish conflict preemption, a defendant must prove: "(1) the state law claims address an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claims directly affect the relationship among traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Memorial Hospital System v. Northbrook Life Ins. Co.*, 904 F.2d 236, 245 (5th Cir. 1990); *see also Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 382 (5th Cir. 2011) (quoting *Northbrook*).[43]  The Fifth Circuit has also emphasized that preempted state law claims are those that are "dependent on or derived from [a beneficiary's] right to recover benefits under the [ERISA plan]." *Transitional Hospitals Corp. v. Blue Cross*, 164 F.3d 952, 955 (5th Cir. 1999); *see also, e.g., Memorial Hermann*

---

[43]     The panel's decision in *Access Mediquip* was initially withdrawn.  The Fifth Circuit took *Access Mediquip* en banc and reinstated the panel's decision in full, clarifying its holding in light of other circuit precedent.  *See Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1467 (2013).

*Hospital Sys. v. UnitedHealthcare Ins. Co.*, 2012 WL 92563, at *3 (S.D. Tex. Jan. 11, 2012) (Rosenthal, J.) (addressing "dependency" of state law claim on ERISA plan in assessing § 1144(a) preemption in the context of a motion to remand).

Under the Fifth Circuit's test, ERISA does not preempt MHHS's breach of contract claim.  In this case, MHHS sues Coastal Drilling for breach of contract, *i.e.*, failure to pay benefits in accordance with rates MHHS contracted with HSPC. MHHS seeks to enforce a provision of the Network Access Agreement against Coastal Drilling, not enforce the ERISA Plan.  The claim here is not derived from MHHS's right to receive benefits under the ERISA Plan, and does not "address an area of exclusive federal concern."  *See Central States, Southeast and Southwest Areas Health and Welfare Fund v. Health Special Risk, Inc.*, 2013 WL 2656159, at *3 (N.D. Tex. June 13, 2013) ("The goal of [the] suits . . . would not be to recover plan benefits or to complain about plan administration but to obtain non-ERISA contractual benefits; determining the amount of benefits to be paid by the ERISA plan (as opposed to the contract) would not be the object of the suit."); *North Cypress Medical Center Operating Co. v. CIGNA Healthcare*, 782 F. Supp. 2d 294, 313 (S.D. Tex. 2011) (Ellison, J.) ("Cigna's obligation to pay North Cypress the specified amounts derives from the terms of the 'Discount Agreements' and, thus, CIGNA's alleged breach of the contracts implicates an independent legal duty . . . . Because the

Discount Agreements create a legal duty apart from the ERISA plans and resolution of the claim does not necessarily require interpretation of the plan, North Cypress' breach of contract claim is not preempted by ERISA."). The case at bar is similarly distinguishable from other cases where plaintiffs seek to enforce a provision of an ERISA plan through a state law breach of contract claim, a claim that would be preempted. *See, e.g.*, *Gonzalez v. Autozone, Inc.*, 775 F. Supp. 2d 405, 411 (S.D. Tex. 2011). In short, MHHS's contract claim for breach of the Network Access Agreement is a state law cause of action that could not have been brought pursuant to ERISA, and is not preempted by Section 1144(a). *See also Access Mediquip*, 662 F.3d at 385-86 ("State law claims of the kind asserted . . . concern the relationship between the plan and third-party, non-ERISA entities [regarding expected payments] . . . [which] is not a domain of behavior that Congress intended to regulate with the passage of ERISA . . .").

The cases that Coastal Drilling cites in support of its preemption argument are distinguishable. In *Memorial Hermann Hospital System v. UnitedHealthcare Insurance Company* ("*UnitedHealthcare*"), Judge Lee Rosenthal held that the plaintiff's breach of contract claim was preempted because determining whether the contract was breached required consulting "the administrative record to determine whether the claims were excluded under the relevant ERISA plan terms." 2012 WL

92563, at *3 (S.D. Tex. Jan. 11, 2012).   At issue in that case, however, was a determination of the right to payment for medical services that allegedly were limited by the ERISA plan.   As Judge Rosenthal noted, "ERISA preempts the cause of action for breach of contract to the extent it is premised on UnitedHealthcare's determination that the medical treatment provided was not medically necessary." *Id.* In other words, the source of any obligation in *UnitedHealthcare* derived from the ERISA plan itself.   Here, both parties agree that payment was owed to MHHS, but they disagree about the amount owed and the relevant agreement for determining that amount.[44]   Because MHHS seeks to enforce a contract distinct from Coastal Drilling's Plan, its claim is unlike that in *UnitedHealthcare*.

The discussion in *Northbrook* is inapplicable for the same reasons.   The Fifth Circuit there affirmed dismissal of plaintiff's state law claims that were asserted "as an assignee of" the patient, for whom medical insurance coverage was denied.   *See Northbrook*, 904 F.2d at 250.   Here, on the other hand, MHHS sues Coastal Drilling in the breach of contract claim in MHHS's own right under the Network Access

---

[44]   Coastal Drilling argues that the Plan governs the amounts owed, while MHHS cites to the Network Access Agreement as a basis for determining what Coastal Drilling owes.

Agreement; MHHS's claim is not derivative of MF's rights under the ERISA Plan.[45]

Reference to the ERISA Plan in the TPA Agreement as a measure of benefits or damages is also insufficient to trigger preemption.  Defendants admit they are bound to the TPA Agreement, which obligates them to "pay claims of Participating Providers in accordance with the applicable Plan and the PPO Contracted Rates."[46] Defendants contend, however, that "it is impossible to determine whether Defendants breached its contractual language without interpreting the terms of the Plan document."[47]  Because they agree some obligation was due to MHHS, Defendants, in effect, argue that MHHS's potential damages can only be determined by referring to the ERISA Plan (*i.e.*, the APL).  The Fifth Circuit and lower courts have rejected preemption on these grounds alone.  *See Rozzell v. Security Services, Inc.*, 38 F.3d 819, 822 (5th Cir. 1994); *Central States*, 2013 WL 2656159, at *3.

---

[45]    In contrast, MHHS admits that its ERISA claim in this suit is asserted as an assignee of MF. *See* Plaintiff's Motion [Doc. # 39], ¶ 18.  MHHS's assignee status with regard to its ERISA claim does not, however, prevent it from suing Coastal Drilling independently for breach of a different contract. *See Baylor Univ. Medical Center v. Epoch Group, L.C.*, 340 F. Supp. 2d 749, 760 n.9 (N.D. Tex. 2004) ("That Baylor could have sued as an assignee is not dispositive. . . . Given Baylor's independent right of action as a creditor, the court will not recharacterize Baylor as an assignee."). Moreover, assignment of a claim does not, in itself, "result in complete preemption of [the] claim." *Paragon Office Servs., LLC v. Aetna, Inc.*, 2012 WL 24231-3, at *6 (N.D. Tex. June 27, 2012).

[46]    TPA Agreement, at 3, ¶ 2.2.

[47]    Defendants' Response and Reply [Doc. # 40], at 6.

MHHS's breach of contract claim is not, as Defendants term it, "a collateral attack on the Plan's correct benefit determination" or a "end run around ERISA."[48] MHHS's claim does not address or rely on the ERISA Plan; instead, the breach of contract claim seeks to enforce provisions of a separate contract, the Network Access Agreement, which MHHS asserts is enforceable against Defendants. The Court does not need to analyze the terms of the ERISA Plan to determine whether Defendants have breached the Network Access Agreement. Accordingly, MHHS's breach of contract claim is not preempted.

### 2. Merits of MHHS's Claim: MHHS's Ability to Enforce the Network Access Agreement Against Coastal Drilling

MHHS, a non-party to the Network Access Agreement, seeks to enforce that agreement against Coastal Drilling, another non-party to the agreement.[49] MHHS asks too much. The Network Access Agreement, by its terms, belies this result, and other agreements into which the parties to the Network Access Agreement have

---

[48]   Defendants' Motion [Doc. # 35], at 16.

[49]   MHHS makes clear several times in its briefs that it seeks to enforce the Network Access Agreement in particular against Coastal Drilling. *See, e.g.*, Plaintiff's Motion [Doc. # 39], ¶ 29 ("The breach of contract claim is independent of ERISA; its focus is Defendants' breach of the Healthsmart/PPOplus contract."); *id.*, ¶ 32 ("The thrust of Memorial's claim is based on Defendants' failures to comply with the terms of the Healthsmart/PPOplus contract . . ."); *id.*, ¶ 34 ("First, the Healthsmart/PPOplus contract is a valid and enforceable agreement, to which Defendants are bound as payors . . .").

entered are insufficient reeds to support MHHS's claims.

In order to prevail on a breach of contract claim under Texas law, a plaintiff must establish the existence of a contract, the performance or tender of performance by the plaintiff, a breach by the defendant and damages as a result of that breach. *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003) (citing *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex.  App.—Houston [14th Dist.] 2000, no pet.)).  A breach occurs when a party fails or refuses to do something he has promised to do. *Townewest Homeowners Ass'n, Inc. v. Warner Communication Inc.,* 826 S.W.2d 638, 640 (Tex.App.– Houston [14th Dist.] 1992, no writ); *Intermedics, Inc. v. Grady,* 683 S.W.2d 842, 845 (Tex.App.– Houston [1st Dist.] 1984, writ ref'd n.r.e.).

MHHS asserts that Defendants breached Section 11 of the Network Access Agreement.  As stated above, the Network Access Agreement is a contract between PPOplus and HSPC governing the relationship between those parties and providing access by each party's "Clients" into the other party's network of providers.  Section 11 of that agreement provides, in part, that each party "shall require client to pay claims of Participating Providers in accordance with the applicable Plan and the

[other party's] Contracted Rates."[50]  MHHS contends that this provision requires

Coastal Drilling, a PPOplus client, to pay for the hospital services rendered to MF

according to the rates set forth in MHHS's agreement with HSPC.[51]  Moreover,

MHHS argues that Coastal Drilling was also bound by the time requirements for

claim payments under Section 11 of the Network Access Agreement.  MHHS claims

that Coastal Drilling waived the benefit of a discounted rate for services by not

paying MHHS in a timely manner.[52]

     Defendants, in contrast, assert that Section 11 is unenforceable against them,

because "Defendants can only be held liable for breaching obligations they

incurred."[53]  While Defendants admit that they are bound by the provisions of the

TPA Agreement, they argue that they did not enter into any of the other agreements

(including the Network Access Agreement) and incurred no obligation under them.[54]

Defendants read Section 11 of the Network Access Agreement to impose obligations

to MHHS on PPOplus and HSPC, not on Defendants.  Defendants also contend that,

---

[50]     Network Access Agreement [Exh. 3 to Doc. # 37-1], ¶ 11.

[51]     Plaintiff's Motion [Doc. # 39], ¶ 34.

[52]     *Id.*, ¶¶ 34, 36.

[53]     Defendants' Response and Reply [Doc. # 40], at 5.

[54]     *Id.*

in any event, they are not a "Client" of either PPOplus or HSPC.[55]

Both parties here agree that, generally speaking, Texas law permits multiple contracts to be read together to comprise a single contract.[56]  Indeed, Texas law is clear that, in certain circumstances, a Court may "construe all the documents as if they were part of a single, unified instrument." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000); *see also GPA Holding, Inc. v. Baylor Health Care Sys.*, 344 S.W.3d 467, 474 (Tex. App.–Dallas 2011, pet. denied) (reading multiple contracts to constitute a single contract).  A court may read "instruments pertaining to the same transaction" together to "ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." *Forth Worth Indep. Sch. Dist.*, 22 S.W.3d at 840. Moreover, in some instances, two parties might be bound to a contractual provision even where the contract was not executed between them.  *See Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981) ("Several decisions indicate that instruments may be construed together or treated as one contract even though they are not between the

---

[55]     *Id.*, at 5-6.  Defendants argue that the Network Access Agreement defines "Clients" as "insurers, payors, and third party administrators who, by separate agreements" have entered into contracts with HSPC or PPOplus, and that only ISI, and not Defendants, has an agreement with PPOplus.  *Id.*, at 6.

[56]     *See* Plaintiff's Motion [Doc. # 39], ¶ 41; Defendants' Response and Reply [Doc. # 40], at 3-4.

same parties.").

In *Baylor University Medical Center v. Epoch Group, L.C.*, 340 F. Supp. 2d 749 (N.D. Tex. 2004), Judge A. Joe Fish considered a set of interconnected contracts similar to the circumstances at bar.  There, Baylor University Medical Center and other plaintiffs (collectively, "Baylor") brought a breach of contract claim against Epoch Group, L.C. ("Epoch"), alleging that Epoch had failed to pay for certain medical services Baylor had rendered for a participant of an ERISA plan that Epoch supervised.  *Id.* at 751-52.  Epoch previously had entered into a contract with Private Healthcare Systems, Inc. ("PHCS"), pursuant to which "Epoch received financial incentives to encourage participants in the Plan to choose treatment from medical providers in the PHCS network of providers."  *Id.* at 752.  Baylor had signed an agreement with PHCS to join the latter's network of providers.  *Id.*  Finally, Epoch signed a "Payor Acknowledgment" under which it contracted to pay PHCS providers under the terms of PHCS's contracts with those providers.  *Id.* at 752.

Judge Fish held that, under Texas law, the contracts at issue could be read as one.  *See id.* at 754-56.  Judge Fish noted that "the instruments expressly refer to one another, showing an intertwined relationship between the parties and the instruments at issue."  *Id.* at 755.  Moreover, the court noted that the Payor Acknowledgment, which Epoch signed, "acknowledges the contracts between PHCS and health care

providers such as Baylor . . . [and] expressly requires Payors to pay for health care services and to comply with preferred providers agreements." *Id.* By agreeing to assume Payor status, the court concluded, "Epoch assumed *both rights—i.e.*, the right to discounts for medical services rendered by Baylor—*and obligations—i.e.*, the obligation to pay Baylor in accordance with the Hospital Services Agreement." *Id.* at 756 (emphasis in original). At least one Texas appellate court since *Epoch* has read similar contractual schemes to constitute a single contract. *See GPA Holding*, 344 S.W.3d at 473-74 (reading together three written instruments similar to those in *Baylor* to conclude that defendant-appellant was bound by agreement between health care provider and operator of network).

The Court concludes that MHHS cannot enforce the Network Access Agreement against Defendants. This case differs from *Epoch* in two significant ways.[57] First, in *Epoch*, the responsible party (Epoch) had signed a "Payor Acknowledgment" which identified the other contracts among the network operator (PHCS) and its health care providers (*e.g.*, Baylor) *and* "expressly require[d] Payors

---

[57] The Court recognizes that it is not bound by *Epoch*, but nevertheless finds its analysis persuasive. Furthermore, neither Plaintiff nor Defendants have presented the Court with copies of the contracts at issue in *Epoch* or any similar case, and the Court has not had an opportunity to compare the text of those contracts to the contracts at issue here. The Court's conclusion is based on its independent review of the contracts presented in this case in light of the principles articulated by the *Epoch* court.

to pay for health care services and to comply with preferred provider agreements."
*Epoch*, 340 F. Supp. 2d at 755.  The *Epoch* Court noted that Epoch was only entitled
to benefit from the agreements by PHCS and its providers by executing the Payor
Acknowledgment.  *Id.* at 756.  In the case here, however, there is no evidence that
Coastal Drilling signed a "Payor Acknowledgment" or similar contract that would
bind it to the MHHS/HSPC Hospital Service Agreement or the PPOplus/HSPC
Network Access Agreement.  Nor is there any document signed by Coastal Drilling
(or ISI) that establishes that the various relevant agreements among at least four
entities serving different purposes (the Hospital Service Agreement, Network Access
Agreement, and TPA Agreement) should be treated as a single contract.  *See id.*
("Indeed, all three instruments were required to complete the relationship between the
parties . . . . Payor Acknowledgments serve no apparent purpose other than to commit
Payors to comply with the terms and conditions of the provider agreements.").[58]

Second, MHHS is not a party to the Network Access Agreement, the contract
it seeks to enforce, and that agreement expressly disclaims an intent that third-parties

---

[58]    Consistent with this conclusion, one Texas appellate court noted the absence of a
Payor Agreement in affirming summary judgment on a breach of contract claim in
favor of a third-party insurance administrator.  *Lubbock Heart Hospital, L.P. v.
Olympus Managed Health Care, Inc.*, 2011 WL 5374751, at *3 (Tex. App.—Amarillo
Nov. 8, 2011, no pet.) (noting that "Heart Hospital can point to no agreement signed
by Olympus undertaking such commitments," but actually holding for other reasons
that no breach of contract claim was viable "even if a contractual relationship
existed").

obtain enforceable contractual rights under it.[59]   Rather, the Network Access Agreement, as fully executed,[60] obligates PPOplus and HSPC to "require their respective Clients" to pay claims "in accordance with the applicable Plan and the [other party's] Contracted Rates."[61]   To the extent Coastal Drilling is a "Client" of PPOplus or HSPC under the Network Access Agreement, it is the duty of those network providers to require certain payments.  The network providers undertook an obligation to MHHS; the agreement does not obligate Coastal Drilling directly. Nothing in the Network Access Agreement specifically obligates Coastal Drilling to pay MHHS the rates for which it contracted with HSPC.  Even if it did, MHHS has not shown how to reconcile this obligation with the agreement's rejection of third-party beneficiary rights.  *See also GPA Holding*, 344 S.W.3d at 474 (finding that health care provider could enforce agreement against third-party administrator because "[r]eading the three agreements together, GPA committed to abide by the

---

[59]     Network Cross Access Agreement, at ECF-page 54, ¶ 16 ("The obligation of each party to this Agreement shall inure solely to the benefit of the other party, and no person or entity shall be a third-party beneficiary of this Agreement.").  The TPA Agreement contains a similar provision. *See* TPA Agreement, ¶ 5.4 ("The obligations of each party to this Agreement shall inure solely to the benefit of the other party, and no Beneficiary or other person or entity shall be a third party beneficiary of this Agreement.").

[60]     *See generally* Network Access Agreement; Network Cross Access Agreement.

[61]     *See* Network Access Agreement, ¶ 11 ("HSPC shall require Client . . . . Client shall be required . . ."); Network Cross Access Agreement, at ECF-page 53, ¶ 11 ("Each party shall require their respective Clients . . .").

terms of the HSA and to pay or arrange to pay Baylor in accordance with the HSA").[62]

It is true that Coastal Drilling's entry into the TPA Agreement presumed that PPOplus (or HSPC, through the Network Access Agreement) would enter into contracts with health care providers to create a network of providers that Coastal Drilling could access.[63]  The TPA Agreement "could not operate effectively without [PPOplus] contracting with providers through hospital services agreements." *Epoch*, 340 F. Supp. 2d at 755.  The mutual interests of separate entities alone, however, does not give MHHS the right to enforce the Network Access Agreement, a contract to which it is not a party, against Coastal Drilling, who is also not a party to the contract.

Accordingly, because MHHS, as a matter of law, cannot enforce the Network Access Agreement against Coastal Drilling, the Court denies MHHS's Motion for Summary Judgment and grants Coastal Drilling's Motion for Summary Judgment as to MHHS's breach of contract claim.

---

[62]    In *Epoch*, the court found the third-party beneficiary disclaimer to conflict with other provisions that "specifically obligate Epoch to pay Baylor for medical services rendered and to otherwise comply with the Hospital Services Agreement." *Epoch*, 340 F. Supp. 2d at 756.  The court there reconciled those conflicting provisions by their terms and held that Epoch had obligated itself to the provisions of PHCS's agreement with Baylor, such that the third-party beneficiary disclaimer did not apply to Baylor.  *Id.*  The same cannot be said in this case.

[63]    *See* TPA Agreement, at 1 ("WHEREAS, TPA is an entity providing services to self-funded welfare benefit plans and wishes to make available a provider network for the provision of medical, hospital and other health services available to Groups[.]").

B.    **ERISA Claim**

MHHS also contends that Coastal Drilling failed to pay it proper benefits under the terms of the ERISA Plan for services MHHS rendered to MF, and brings a claim pursuant to 29 U.S.C. § 1132(a)(1)(B) to recover those benefits.

### 1.    Legal Authority

A plaintiff may bring an action under ERISA "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."   29 U.S.C. § 1132(a)(1)(B).   Where an ERISA plan gives a plan administrator "discretionary authority to determine eligibility for benefits," a district court reviews an eligibility determination under a deferential, abuse-of-discretion standard.   *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 111, 115 (1989); *see also Atkins v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 694 F.3d 557, 566 (5th Cir. 2012).   "A plan administrator abuses its discretion if it acts arbitrarily or capriciously."   *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 508 (5th Cir. 2013).   A plan's fiduciary does not abuse her discretion if the decision is supported by substantial evidence—that is, "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *See Atkins*, 694 F.3d at 566 (citing *Ellis*

*v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004)).  The court "need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end."  *Id.*

The Supreme Court has warned, however, that where "a benefit plan gives discretion to an administrator or fiduciary who is *operating under a conflict of interest*, that conflict must be *weighed as a 'factor* in determining whether there is an abuse of discretion.'"  *Metro. Life Ins. Co.*, 554 U.S. at 111 (quoting *Firestone*, 489 U.S. at 115) (emphasis in original).  In *Metropolitan Life Insurance Company*, the Supreme Court held a conflict of interest arises where an employer "both funds the plan and evaluates the claims," because "[t]he employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary."  *Id.* at 112; *see also Truitt*, 729 F.3d at 508 ("A plan administrator has a conflict of interest if it both evaluates claims for benefits and pays benefits claims." (internal quotations omitted)).  In elucidating how courts should assess this "factor," the Supreme Court noted that, like any other factor in the equation, the fact of a conflict could "act as a tiebreaker when the other factors are closely balanced."  *Id.* at 117.  Moreover, the Court stated that the factor's import depends on the circumstances: it is more important "where circumstances suggest a higher likelihood that it affected the benefits decision," and is less important "where

the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id*; *see also Truitt*, 729 F.3d at 508-09 (citing *Metro Life Ins. Co.*).

Coastal Drilling both funds the ERISA Plan and acts as its administrator and fiduciary.[64]   Under the ERISA Plan, Coastal Drilling, the Plan administrator, and ELAP, Inc. ("ELAP"), its DDM, have:

> [M]aximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits . . . , to decide disputes which may arise relative to a Plan participant's rights, and to decide questions of Plan interpretation and those of fact relating to the Plan.[65]

Moreover, Coastal Drilling has assigned ELAP "discretionary authority and ultimate decision-making authority with respect to any appeals or denied claims" and "with respect to the review and audit of certain claims in accordance with the applicable Plan provisions under the section, 'Claim Review and Audit Program.'"[66]

The Court assumes Coastal Drilling and ELAP are to be viewed as a single entity for purposes of ascertaining if a conflict exists.  The Court will therefore factor in the conflict in determining the merits of the claim.

---

[64]   *See* ERISA Plan [Doc. # 37], at 67 (funding of Plan), 70 (administrator/fiduciary assignment).

[65]   Amendment No. Two to ERISA Plan [Exh. 3 to Doc. # 35], at 11.

[66]   *Id.*

### 2.    Merits

Coastal Drilling maintains that the ERISA Plan permits it only to pay benefits within APL, and no benefits in excess of APL.[67]  Coastal Drilling argues that it (or ELAP as its designee) calculated the APL for MF's treatments to be $99,476.45.[68] Based on that determination, Coastal Drilling denied other charges as exceeding the APL, the actual costs of the procedure, the 90th percentile of the Physicians Fee Reference, or because the charges were determined to be billing errors or in need of additional documentation.[69]

MHHS does not meaningfully contest the merits of the reasoning behind Coastal Drilling's benefits determination under the Plan.  Indeed, MHHS does not provide any alternate calculation of the APL, nor does it suggest any other method of calculating benefits pursuant to the ERISA Plan.  Instead, MHHS relies on other contracts (namely, the Network Access Agreement) to argue that the PPO Contracted Rates, rather than the APL, should govern the benefits determination.[70]  MHHS also

---

[67]    *See id.*, at 1-2.  Coastal Drilling does not contest that MHHS is entitled to benefits as an "assignee" of MF.

[68]    *See* Defendants' Motion [Doc. # 35], at 20.  The Court notes that Coastal Drilling initially determined the APL to be $89,127.27, but adjusted that number upwards after additional review.

[69]    *Id.*, at 19-20.

[70]    *See* Plaintiff's Motion [Doc. # 39], ¶¶ 18-27, 45-51.

argues that the ERISA Plan *allows* the APL to be considered as the maximum amount for reimbursement, but does not *require* that amount to be the maximum.[71]   The ERISA Plan[72] states unequivocally that Coastal Drilling—that is, the Plan and its administrators—may apply the APL "in lieu of any PPO network provider hospital's per diem, DRG rates or PPO discount rates as the amount considered for reimbursement under the Plan."[73]   Essentially, MHHS here reasserts through its ERISA claim its right to additional benefits because of Coastal Drilling's alleged other contractual obligations.  MHHS may only use its ERISA claim, however, to seek benefits due under the ERISA Plan itself.  Any purported conflict between the Plan and those contracts does not establish a dispute regarding benefits due to MHHS under the Plan itself.  Thus, MHHS's contention that the ERISA Plan requires approval of payments above the APL is rejected as inconsistent with the Plan terms.

Even if MHHS had contested the factual reasoning of Coastal Drilling's benefits determination under the language of the Plan, Coastal Drilling is entitled to summary judgment on MHHS's ERISA claim.  There is substantial evidence to support Coastal Drilling's factual decision under the ERISA Plan.  Coastal Drilling

---

[71]     *See* Plaintiff's Reply [Doc. # 41], ¶ 10.

[72]     MHHS quotes the Plan's language only in part.

[73]     Amendment No. Two to ERISA Plan [Exh. 3 to Doc. # 35], at 3.

properly determined that MF, and thus MHHS, was entitled to benefits under the ERISA Plan, and used the APL to calculate those benefits.  Coastal Drilling then reviewed that determination twice in light of MHHS's appeals, and made further adjustments based on the issues MHHS raised.  MHHS has not demonstrated what, if anything, was inaccurate about the particulars of that calculation.  Moreover, while there is no question that Coastal Drilling had a structural conflict of interest given its dual roles in administering and funding the Plan, *see Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 514 (5th Cir. 2013), there is no evidence that bias affected Coastal Drilling's decision.  If anything, the evidence shows that Coastal Drilling gave "careful consideration" to MHHS's claim.  *See id.* at 515.  Because there is substantial evidence in support of the decision, MHHS has failed to show that Coastal Drilling has abused its discretion by acting arbitrarily and capriciously.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to MHHS's ERISA claim.

## IV.   CONCLUSION AND ORDER

For the reasons stated above, the Court has jurisdiction to address MHHS's breach of contract claim, which is not preempted.  The Court concludes that MHHS, a non-party to the Network Access Agreement, cannot enforce the terms of that agreement against Coastal Drilling, another non-party to that agreement.  Moreover,

MHHS has failed to demonstrate a genuine fact issue concerning Coastal Drilling's evaluation of the claims MHHS has submitted.  It is therefore

**ORDERED** that Defendants Coastal Drilling Company, LLC Employee Benefit Trust and Coastal Drilling's Motion for Summary Judgment [Doc. # 35] is **GRANTED**.  Plaintiff Memorial Hermann Health Systems' claims are **DISMISSED with prejudice**.  It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 39] is **DENIED**.

A separate final judgment will be issued.

SIGNED at Houston, Texas, this  31st  day of **March, 2014.**

Nancy F. Atlas
United States District Judge

# EXHIBIT "A"
# Relevant Agreements



| **COASTAL DRILLING** | | **ISI** | | **PPOPLUS** | | **HSPC** | | **MHHS** |

**ERISA Plan**

Coastal Drilling will cover the "Usual and Reasonable Charges, or for claims under the Claim Review and Audit Program, [charges] within the Applicable Plan Limits . . ."

**Administrative Services Agreement**

ISI is required to "[u]se that degree of ordinary care and reasonable diligence in the exercise of its power and duties hereunder that a supervisor of claims under an insured or uninsured employee benefit plan would use acting in like circumstances and familiar with such matters."

**TPA Agreement**

"TPA [*i.e.*, ISI] agrees to pay claims of Participating Providers in accordance with the applicable Plan and the PPO Contracted Rates . . . Failure of Group to provide payment to Participating Providers within thirty (30) days of submission . . . shall . . . constitute a waiver" to pay contracted rates.

**Network Access Agreement**

"HSPC shall require Client to pay claims of Participating Providers in accordance with the applicable Plan and the PPOplus Contracted Rates, which are the rates or fees agreed upon by PPOplus and Participating Provider . . ."

**Hospital Service Agreement**

HSPC agrees "to negotiate, monitor and control the purchase of health care services." MHHS agrees to furnish "Hospital Services"—that is, "inpatient, outpatient and emergency room services"—to covered individuals according to a "Fee Schedule."